Carolyn **WYNACHT**, Plaintiff,

v.

**BECKMAN INSTRUMENTS, INC.**, Defendant.

No. 4:98–CV–007.

United States District Court, E.D. Tennessee, Winchester Division.

Sept. 15, 2000.

G. Thomas Nebel, Nashville, TN, for Plaintiff.

J. Randolph Bibb, Jr., Baker, Donelson, Bearman & Caldwell, Nashville, TN, for Defendant.

## MEMORANDUM AND ORDER

EDGAR, Chief Judge.

On January 26, 1997, while plaintiff Carolyn Wynacht ("Wynacht") was working in a lab at Columbia Southern Tennessee Medical Center in Winchester, a floor drain backed up causing a discharge of wastewater from the Synchron CX–7 lab analyzer onto the lab floor. Wynacht allegedly experienced difficulty with breathing and burning sensations in her nose, eyes, and mouth, and sought medical attention a number of hours later. She has reported respiratory, neurological, digestive, cardiovascular, and urinary problems since the spill, and has not worked since May 1997.

Wynacht brings this lawsuit, asserting claims based on negligence, strict liability, and breach of warranty, against defendant

1. Beckman Coulter, Inc., was formerly known as Beckman Instruments, Inc.

2. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469

Beckman Coulter, Inc.[1] ("Beckman"), manufacturer and seller of the Synchron CX–7 lab analyzer and chemicals present in the wastewater. This matter is presently before the Court on the motion *in limine* (Court File No. 37) by Beckman to exclude the testimony of Wynacht's medical causation expert witness Grace E. Ziem, M.D., pursuant to FED. R. EVID. 702 and the *Daubert/Kumho Tire*[2] line of cases. Each party has moved for leave to file a memorandum of law in excess of twenty-five pages (Court File Nos. 38, 44), and the Court hereby GRANTS these requests. The Court has carefully reviewed these memoranda of law and their accompanying supporting materials and concludes that Beckman's motion *in limine* will be GRANTED. Dr. Ziem will not be permitted to offer an expert opinion on causation of Wynacht's alleged injuries.

### A. Rule 702 and *Daubert*

Evidence Rule 702 provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FED. R. EVID. 702. It is abundantly clear that, pursuant the Supreme Court's decision in *Daubert,* Rule 702 imposes an affirmative "gatekeeping" duty on the District Courts with regard to the admission of expert testimony. *See Kumho Tire,* 526 U.S. at 147, 119 S.Ct. 1167; *General Elec. Co. v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786; *United States v. Thomas,* 167 F.3d 299, 308 (6th Cir. 1999); *Smelser v. Norfolk S. Ry. Co.,* 105 F.3d 299, 303 (6th Cir.1997), *abrogated on*

(1993); *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

*other grounds by Joiner,* 522 U.S. at 143, 118 S.Ct. 512. In the recent *Smithers* case, the Sixth Circuit explained that pursuant to *Daubert* the Court must undertake a two-tiered inquiry when determining the admissibility of expert testimony:

> Under *Daubert,* a trial court should consider: (1) whether the reasoning or methodology underlying the expert's testimony is scientifically valid; and (2) whether that reasoning or methodology properly could be applied to the facts at issue to aid the trier of fact.

*United States v. Smithers,* 212 F.3d 306, 315 (6th Cir.2000); *see also Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167 (objective of *Daubert* "is to ensure the reliability and relevancy of expert testimony"); *Greenwell v. Boatwright,* 184 F.3d 492, 498 (6th Cir.1999) ("court is required to make an initial assessment of the relevance and reliability of the expert testimony"); *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 260 (4th Cir.1999) (describing the two-pronged reliability/relevance *Daubert* inquiry); *Thomas,* 167 F.3d at 308 ("trial court must still serve as a gatekeeper in ensuring that any and all scientific testimony or evidence admitted is not only relevant, but reliable as well") (citing *Daubert,* 509 U.S. at 589, 597, 113 S.Ct. 2786); *Zuchowicz v. United States,* 140 F.3d 381, 386 (2d Cir.1998) (*Daubert* requires an assessment of both the expert's methodology and its relevance to the facts of the case); *Cummins v. Lyle Indus.,* 93 F.3d 362, 367–68 (7th Cir.1996) (describing these two inquiries mandated by *Daubert* ).

### B. The Reliability Prong

■ The first prong of the *Daubert* examination, reliability, requires the Court to assess carefully the methodology, reasoning, or technique employed by the expert. *See Pride v. BIC Corp.,* 218 F.3d 566, 577 (6th Cir.2000); *Smithers,* 212 F.3d at 313; *Greenwell,* 184 F.3d at 496–97; *Hartwell v. Danek Med., Inc.,* 47 F.Supp.2d 703, 711 (W.D.Va.1999). According to the Sixth Circuit, the function of this inquiry is to distinguish between two types of expert opinions. "An expert opinion that is based on scientifically valid principles will satisfy FED. R. EVID. 702; an expert's subjective belief or unsupported speculation will not." *Smelser,* 105 F.3d at 303 (citing *Daubert v. Merrell Dow Pharm., Inc.,* (on Remand), 43 F.3d 1311, 1316 (9th Cir.1995)); *see also Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996) (noting that *Daubert* requires "judges to distinguish between real and courtroom science").

■ The party offering the opinion evidence bears the burden of demonstrating that it comports with and is undergirded by the dictates and procedures of " 'sound science.' " *Id.* (citing *Daubert* (on Remand), 43 F.3d at 1316); *see also Braun v. Lorillard Inc.,* 84 F.3d 230, 235 (7th Cir.1996) ("If, therefore, an expert proposes to depart from the generally accepted methodology of his field and embark upon a sea of scientific uncertainty, the court may appropriately insist that he ground his departure in *demonstrable and scrupulous adherence to the scientist's creed of meticulous and objective inquiry.*") (emphasis added). The Court's role—and the offering party's responsibility—is

> to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the *same level of intellectual rigor that characterizes the practice of an expert in the relevant field.*

*Kumho Tire,* 526 U.S. at 153, 119 S.Ct. 1167 (emphasis added); *see also Watkins v. Telsmith. Inc.,* 121 F.3d 984, 991 (5th Cir.1997) (district court should verify that "the opinion comports with applicable professional standards outside the courtroom"); *Braun,* 84 F.3d at 235 (noting the potential abuse where experts shirk "the methods that they use when they are doing their regular professional work [in the course of] being paid to give an opinion helpful to one side of a lawsuit"). *See generally* J. Brook Latham, *The "Same Intellectual Rigor" Test Provides an Effective Method for Determining the Reliabili-*

ty of All *Expert Testimony, Without Regard to Whether the Testimony Comprises "Scientific Knowledge" or "Technical or Other Specialized Knowledge"*, 28 U. MEM. L. REV. 1053, 1057–75 (1998) (extensively and insightfully advocating, pre-*Kumho Tire*, the application of this principle).

To facilitate the reliability inquiry, the *Daubert* Court suggested a non-exhaustive list of factors which the district court may find applicable. *See Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786; *see also Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167 (mentioning the four factors); *United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir.1997) (quoting the *Daubert* factors); *Smelser*, 105 F.3d at 303 (same); *Glaser v. Thompson Med. Co., Inc.*, 32 F.3d 969, 972 (6th Cir.1994) (same). Not long after *Daubert* was decided, Judge Wiseman of the Middle District of Tennessee included these four factors in a helpful battery of questions to be applied when evaluating the reliability of a proffered expert opinion:

> (1) has it been or can it be tested? (2) has it been subjected to peer review? (3) what is the potential rate of error? (4) how much acceptance does it have within the relevant scientific community?

*Hein v. Merck & Co., Inc.*, 868 F.Supp. 230, 231 (M.D.Tenn.1994). This list of factors,[3] while beneficial in many cases, is not exclusive and may not be pertinent to the circumstances of a particular lawsuit as well as the nature of the expert's testimony. *See Daubert*, 509 U.S. at 593, 113 S.Ct. 2786; *Kumho Tire*, 526 U.S. at 152–53, 119 S.Ct. 1167; *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1082 (8th

Cir.1999); *Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir.1999). The district court's paramount objective is to discern the reliability of a technique, theory, or procedure employed by the expert witness. *See Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167; *Pride*, 218 F.3d at 577.

██ Turning to the instant case and the reliability of Dr. Ziem's opinions, the Court notes initially that Wynacht has helpfully summarized not only Dr. Ziem's role in this litigation but also the bases for her conclusions.[4] Wynacht explains that Dr. Ziem opines "that plaintiff's exposure to the chemicals discharged from the Beckman CX–7 Analyzer caused her medical conditions." (Court File No. 43, p. 2). Dr. Ziem has diagnosed Wynacht as suffering from some eighteen medical conditions: toxic encephalopathy, impaired detoxification, adrenal insufficiency, pancreatic enzyme deficiency, reactive airways disease, angina, immune deficiency characterized by decreased secretory IgA, nutritional deficiencies, impairment of energy metabolism, impairment of neurotransmitter metabolism, neurogenic inflammation of the respiratory system, neurogenic inflammation affecting the bladder, recurrent urinary tract infections, changes in lipid composition of cell membranes, arrythmias, chronic fatigue syndrome, fibromyalgia, and heightened sensitivity. (*See* Court File No. 43, Ziem Litig. Dep., pp. 70–85[5]). Further, Wynacht informs the Court that:

> Dr. Ziem's testimony will be based on her role, not just as a hard scientist, but rather as a clinical treating physician,

**3.** The Court will refer to these four factors as the *"Daubert* factors."

**4.** Dr. Ziem has not testified in person about her opinions before this Court. A hearing on this motion *in limine* was scheduled for mid-June and then rescheduled for August 8, 2000. The purpose for this hearing was to permit Dr. Ziem to state her conclusions and findings and the reasoning or methodology underlying them. On August 1, 2000, counsel for Wynacht informed the Court that Dr. Ziem would be unavailable to testify at the

August 8 hearing. Given the impending trial date of September 26, 2000, the parties agreed that the Court should cancel the hearing and proceed to evaluate Dr. Ziem's testimony on the basis of the parties' written submissions. (*See* Court File No. 44).

**5.** Court File No. 43 contains excerpts from two depositions given by Dr. Ziem. The Court will refer to the deposition testimony given in this litigation as "Ziem Litig. Dep." and the deposition given in Wynacht's workers' compensation matter as "Ziem W.C. Dep."

based on her examination and testing of plaintiff, her experience in treating hundreds of other patients with toxic injuries, and the "hundreds of hours" Dr. Ziem has spent involved in plaintiff's care and well-being.

(*Id.*). With this characterization generally in mind, and after careful perusal of the record, it becomes abundantly clear to the Court that Dr. Ziem's testimony falls well short of the standard for scientific reliability pursuant to Rule 702 and *Daubert.*

First and foremost, there is a fundamental distinction between Dr. Ziem's ability to render a medical diagnosis based on clinical experience and her ability to render an opinion on causation of Wynacht's injuries. Beckman apparently does not dispute, and the Court does not question, that Dr. Ziem is an experienced physician, qualified to diagnose medical conditions and treat patients. The ability to diagnose medical conditions is not remotely the same, however, as the ability to deduce, delineate, and describe, in a scientifically reliable manner, the causes of those medical conditions.

Second, to provide a reliable expert causation opinion, Dr. Ziem must show a connection, based on a reliable scientific methodology, between the chemical spill and the various medical conditions that she has diagnosed for Wynacht. Wynacht states that "Dr. Ziem's opinion is that the exposure to the combination of irritants form [*sic.*] the CX–7 induced plaintiff's Reactive Airways Disease, and that the combination of neurotoxic agents as well as entry into the brain of agents that would not otherwise be neurotoxic were the factors that induced plaintiff's chronic permanent brain damage, or toxic encephalopathy." (Court File No. 43, p. 14). The record contains a listing, compiled by Beckman senior environmental specialist Kristine L. Baker and derived from the laboratory records, of the chemicals in use in the Synchron CX–7 at Columbia Southern Tennessee Medical Center on January 25–26, 1997. (Court File No. 37, Ex. 4). Dr. Ziem stated in her deposition that she utilized this listing in determining that Wynacht was exposed to chemicals. (*See* Ziem Litig. Dep., pp. 43–44). Dr. Ziem does not, and apparently cannot, state through a reliable scientific methodology how these various chemicals caused toxic encephalopathy, fibromyalgia, chronic fatigue syndrome, and the other conditions she has diagnosed for Wynacht.

In short, Dr. Ziem's opinion that the chemicals present in the Synchron CX–7 caused Wynacht's fibromyalgia, chronic fatigue syndrome, toxic encephalopathy, and other health problems, is based solely on the temporal relationship between the January chemical spill, burning sensations reported by Wynacht, and Dr. Ziem's subsequent diagnosis of eighteen maladies. (*See id.* at 239–46). Given the complex nature of the facts giving rise to this litigation, this perceived temporal connection, especially given Dr. Ziem's failure to identify any biochemical, medical, or toxicological principles or studies supporting it, falls well short of the *Daubert* reliability standard. *See, e.g., Heller v. Shaw Indus.*, 167 F.3d 146, 158–59 (3d Cir.1999); *Westberry*, 178 F.3d at 263–66. Dr. Ziem's methodology simply does not reflect the intellectual rigor required of experts pursuant to Rule 702.

Reviewing Dr. Ziem's reasoning through the lens of the *Daubert* factors, for instance, solidifies the Court's conclusion that she is incapable of rendering a reliable opinion on causation. Not only has Dr. Ziem not personally undertaken any testing that would support her conclusion that the wastewater ingredients caused Wynacht's ailments, but she also states that she is unaware of any testing of these chemicals by others. (*See* Ziem Litig. Dep. pp. 119, 121–22, 142–45). Additionally, Dr. Ziem stated in her deposition that she is not familiar with studies of the effects of these chemicals. (*See id.* at 121–23). Such biochemical testing, Dr. Ziem concedes, would be possible, helpful, and illustrative. (*See id.* at 142–45, 226–27). Dr. Ziem has also stated that she does not

know of any other scientific or medical literature in support of her causation opinion. (*See id.* at 231–32, 234–39). Consequently, there has been neither verification through testing of Dr. Ziem's conclusions, nor have they been subject to peer review, nor has Dr. Ziem identified any rate of error. Without testing data or support in scientific or medical literature, the Court cannot say with any confidence whether her reasoning would have any acceptance in the medical or scientific communities.

In contrast, an entire field of scientific research, toxicology, is concerned with examining and identifying the effects of chemicals on organisms and organ systems. *See* David L. Eaton & Curtis D. Klaassen, *Principles of Toxicology, in* CASARETT & DOULL'S TOXICOLOGY: THE BASIC SCIENCE OF POISONS 13, 13 (Curtis D. Klaassen 5th ed.1996) [hereinafter CASARETT & DOULL'S TOXICOLOGY]; FRANK C.LU, BASIC TOXICOLOGY: FUNDAMENTALS, TARGET ORGANS, AND RISK ASSESSMENT 3–9 (2d ed.1991). Research in this field includes inquiries into the effects of chemicals on the occupational environment, *see* Robert R. Lauwerys, *Occupational Toxicology, in* CASARETT & DOULL'S TOXICOLOGY 987, 987–1007, as well as studies of the effects of the interactions of several chemicals, *see* EDWARD J. CALABRESE, MULTIPLE CHEMICAL INTERACTIONS 21–91 (1991).

In general, toxicologists and physicians specializing in occupational medicine undertake a series of inquiries in determining whether a chemical exposure is capable of causing a disease or other impairment. *See* Bernard D. Goldstein & Mary Sue Henifin, *Reference Guide on Toxicology, in* FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 181, 201–12 (1994); Clifton T. Hutchinson & Lee Davis Thames, *Guide to Toxicology, in* EXPERT EVIDENCE: A PRACTITIONER'S GUIDE TO LAW, SCIENCE, AND THE *FJC MANUAL* 117, 123–38 (Bert Black & Patrick W. Lee eds. 1997). Key to these investigations is identifying the level of exposure and how it interacts with various organs or body systems ("dose-response"), both in terms of how the chemical is initially distributed through the organism as well as how it ultimately produces a specific ill-effect. *See* LU, *supra*, at 13–59; Eaton & Klaassen, *supra*, at 15–32. By contrast, Dr. Ziem does not offer any informed assessment of how the chemicals interacted with Wynacht's body systems (other than describing them as having initial "irritant" effects) and how they led to Wynacht's myriad diseases and conditions. Although Rule 702 does not require Dr. Ziem to undertake massive toxicological research in developing her causation opinion, the fact that such principles are well-known and regularly employed bolsters the Court's conclusion that her reasoning does not display the intellectual rigor required of experts testifying the federal courts.

## C.  The Relevance Prong

■ Pursuant to *Daubert*, after looking into the reliability of the expert's opinion, Rule 702 also requires the trial court to evaluate the relevancy of the proposed testimony. *See Daubert*, 509 U.S. at 591, 113 S.Ct. 2786; *Pride*, 218 F.3d at 578; *Smithers*, 212 F.3d at 313; *Thomas*, 167 F.3d at 308. Expert testimony is relevant, and therefore admissible under Rule 702, when it is helpful to the trier of fact. *See Daubert*, 509 U.S. at 591, 113 S.Ct. 2786. Consequently, the Court's task at this stage is to make sure that the expert testimony bears "a valid scientific connection," or "fits," the issues to be resolved at trial. *Id.* at 591–92, 113 S.Ct. 2786. *See also Pride*, 218 F.3d at 578 ("there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify") (citing *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786); *Greenwell*, 184 F.3d at 496 ("The relevance requirement ensures that there is a 'fit' between the testimony and the issue to be resolved by the trial.") (citing *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir.1993)); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146,

152 (3d Cir.1999) (reliable expert testimony must fit the facts of the case); *Smelser*, 105 F.3d at 303 (discussing the " 'fit' requirement"). Having concluded that Dr. Ziem is unable to offer a reliable opinion on the causation of Wynacht's injuries, the Court need not reach this second prong of the *Daubert* inquiry.

Dr. Ziem is, of course, qualified to testify about Wynacht's medical condition. She may not, however, offer any opinion that Wynacht's medical condition was caused by chemicals, fumes, or inhalants from the Synchron CX–7. Accordingly, Beckman's motion *in limine* (Court File No. 37) is **GRANTED.**

SO ORDERED.