## Riccio v. S&T Contractors

C.P. of Chester County, nos. 98-07740, 98-07741, 99-05984, 99-06295 and 99-06359.

*James M. Holston* and *Scott M. Brevic,* for plaintiffs Ramos.

*Philip G. Kircher,* for plaintiff Riccio.

*William J. Weber,* for plaintiff Norman Stephen.

*Joseph M. O'Neill* and *Gino Mecoli,* for defendants Norman Stephen and Roslyn Stephen.

*Kimberley J. Woodie,* for defendant Modern Exterminating and Termite Control Co.

*James K. Fetter,* for additional defendants Cassidy and Custom Contracting.

MAHON, *J.,* June 22, 2001—June 22, 2001 on consideration of the motions in limine of defendants Modern Exterminating and Control Co. Inc. and Norman and Roslyn Stephen seeking preclusion of evidence of a causal link between a deck collapse on July 25, 1997 and plaintiff Carla Ramos' (now Carla Cruse) fibromyalgia syndrome or its aggravation we enter the following:

## OPINION

The factual and procedural history of these consolidated matters is described in detail in our prior orders and will not be repeated here. In particular, the parties, their claims, and the manner of consolidation are described in our order of June 29, 2000.[1] As a précis, "in these consolidated civil actions sounding in negligence, breach of contract, breach of the warranty of habitability, strict liability, and loss of consortium, a homeowner (Norman Stephen) and his guests (William Riccio, Dianne Dryer, Henry Ramos, and Carla Cruse) were injured on July 25, 1997 when an elevated wooden deck, attached to [the Stephens'] single-family home in Easttown Township, Chester County, collapsed during a social event; seek damages from the home's general contractor, the construction superintendent, the deck subcontractor, the homeowners at the time the deck was constructed, the homeowners at the time the deck collapsed, and an exterminating company which was retained more than a year prior to the collapse to inspect the deck. . . ."[2] This description of the litigation at the juncture of initial consolidation includes parties, claims, and issues since dismissed from the matter as a consequence of voluntary discontinuance and our orders resolving a series of preliminary objections, motions for judgment on the pleadings, motions for summary judgment, and motions in limine. As the litigation is presently constituted only the Stephens as the homeowners

---

1. See particularly, marginal note 1 thereof.
2. Order of June 29, 2000 at pp. 1-2.

at the time of the collapse and Modern remain as defendants.

By these motions in limine, both defendants seek to limit the compensable injuries of plaintiff Carla Cruse and, specifically, to preclude the introduction of evidence in support of her claim that the deck collapse and resulting trauma either caused, ab initio, or aggravated a medical condition with which she has been diagnosed: fibromyalgia syndrome.[3] Defendants contend that there is no general consensus in the relevant scientific community that fibromyalgia syndrome is causally related to trauma and, therefore, that evidence of such a relationship, in the form of expert medical testimony or otherwise, is inadmissible.

There can be no doubt that among the duties of this court is the performance of its function as a "gatekeeper" whenever science enters the courtroom and, particularly, when expert testimony relying upon novel scientific evidence is offered. As the Pennsylvania Superior Court explained in *Blum v. Merrell Dow Pharmaceuticals Inc.,* 705 A.2d 1314, 1322 (Pa. Super. 1997), *aff'd* 564 Pa. 1, 764 A.2d 1 (2000):

"[I]n dealing with complex scientific theories, cross-examination is not the appropriate tool to test the speciousness or accuracy of the expert's testimony where the evidence on which that testimony is based is not deemed reliable. . . . [T]he judge as gatekeeper decides whether the expert is offering sufficiently reliable, solid,

---

3. Occasionally also referred to hereinafter (especially in the excerpted authorities cited) as "fibromyalgia," "fibrositis," "fibrositis syndrome," "FM" or "FMS").

trustworthy science. The question is: is the science good enough to serve as the basis for the jury's findings of fact, or is it dressed up to look good enough, but basically [is] so untrustworthy that no finding of fact can properly be based on it. If the latter is true, the integrity of the trial process would be tainted were the jury to consider it."

The United States Supreme Court discussed the necessity of this judicial role in *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 592 (1993) in the following terms:

"Unlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. . . . Presumably, this relaxation of the usual requirement of firsthand knowledge—a rule which represents 'a "most pervasive manifestation" of the common-law insistence upon "the most reliable sources of information," ' . . . is premised on an assumption that an expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* (citations omitted)

In this Commonwealth, a determination of the reliability and, therefore, admissibility of scientific evidence requires the proponent to establish that the evidence concerns a matter which "has achieved 'general acceptance' in the relevant scientific community." *Blum v. Merrell Dow Pharmaceuticals Inc.*, 564 Pa. 3, 4, 764 A.2d 1, 2 (2000).[4] As the Court explained in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923):

---

4. Declining (as unnecessary in the particular case which involved evidence inadmissable under either standard) to adopt in Pennsylva-

"The rule is that the opinions of experts or skilled witnesses are admissible in evidence in those cases in which the matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it, for the reason that the subject-matter so far partakes of a science, art, or trade as to require a previous habit of experience or study in it, in order to acquire a knowledge of it. When the question involved does not lie within the range of common experience or common knowledge, but requires special experience or special knowledge, then the opinions of witnesses skilled in that particular science, art, or trade to which the question relates are admissible in evidence.

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.,* 293 F. at 1014.

There is some uncertainty as to whether it is the witness' *conclusion* or *methodology* or both which must have

---

nia the less restrictive standard determined by the United States Supreme Court in *Daubert* to be mandated in federal jurisprudence by Fed.R.C.P. 702 and refusing to overturn the rule of *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923) adopted as this Commonwealth's governing principle by *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977).

achieved general scientific acceptance as a precondition to evidentiary admissibility. See for example, the dissenting opinion of Mr. Justice Cappy in *Blum* which includes the following discussion:

"The Superior Court is correct that this court has long interpreted *Frye* as requiring that the *methodology* employed by the testifying scientist be generally accepted in the scientific community. See *e.g., Commonwealth v. Blasioli,* 552 Pa. 149, [153], 713 A.2d 1117, 1119 (1998). Yet, we have not stated that the *conclusion* reached by the scientist regarding causation must also be generally accepted in the scientific community.

"As noted by the Superior Court, this additional step in the *Frye* test—requiring that the conclusion also be generally accepted by the scientific community—was added by the Commonwealth Court in *McKenzie v. Westinghouse Electric Corp.,* 674 A.2d 1167 (Pa. Commw. 1996). I cannot find that this court, however, has endorsed this interpretation of the *Frye* test." 564 Pa. at 10, 764 A.2d at 5. (emphasis in original)

But compare the decisions of the Pennsylvania Superior Court reported as *Thomas v. West Bend Co. Inc.,* 760 A.2d 1174, 1177 (Pa. Super. 2000) (approving the trial court's conclusion with respect to the proffered expert witness that "[n]either his exemplary qualifications, nor his extensive experience, nor the soundness of his methodology is sufficient to overcome the novelty of his scientific advance."); *Wack v. Farmland Industries Inc.,* 744 A.2d 265 (Pa. Super. 1999), *appeal denied,* 2001 WL 355678 (Pa. April 10, 2001) (Superior Court's decision in *Blum* "recognized admissibility requires both the

causal relationship and the methodology to be generally accepted by the scientific community."); *Checchio v. Frankford Hospital—Torresdale Division,* 717 A.2d 1058, 1060 (Pa. Super. 1998) ("[T]his court, following *Topa,* ruled that the analysis to be applied in answering the question of whether the *Frye/Topa* admissibility criterion had been met was two pronged: acceptance in the scientific community of first the causal; and then the methodological relationship alleged").

Whatever its intellectual interest and present indeterminacy in the decisions of our Supreme Court, the distinction between conclusory and methodological acceptance is of no moment here because: (1) the parties have neither raised nor briefed the issue; (2) the Superior and Commonwealth Courts (decisions of which are here controlling) have each clearly stated that general scientific acceptance must be an attribute of both; and (3) for the reasons discussed at length below, neither the method nor the causal conclusion proffered by the plaintiff have achieved the consensus requisite to testimonial admissibility.

We note in closing on this preliminary issue that in those cases, like that here presented, which turn on scientific causation, the authorities are clear and uniform that the causal conclusion itself must be accepted as a general matter in the relevant scientific community before expert testimony of the existence of causality in the particular case may be properly admitted. See for example, *Blum,* (causal relationship between ingestion by the mother of the prescription drug Bendectin and fetal abnormalities, *i.e.,* teratogenic property of Bendectin); *Commonwealth v. Dunkle,* 529 Pa. 168, 602 A.2d 830

(1992) (causal connection between sexual abuse and a syndrome of child behaviors); *Thomas* (causal relationship between low voltage shock and cardiomyopathy); *Wack* (causal relationship between ingestion of benzene contaminated drinking water and rare salivary gland cancer); *Checchio* (causal relationship between neonatal respiratory distress and autism); *McKenzie* (causal connection between mother's exposure to gasoline additive contaminated groundwater and neonatal cardiac abnormalities); *Commonwealth v. Miller,* 367 Pa. Super. 359, 532 A.2d 1186 (1987) (causal connection between alcohol consumption and horizontal gaze nystagmus). See also, *Wimberly v. Wyeth Laboratories Inc.,* 48 Leh.L.J. 47 (1998) (causal connection between use of Norplant contraceptive and patient's stroke); *Trach v. Thrift Drug Inc.,* 46 D.&C. 4th 231 (Lehigh Cty. 2000) (causal relationship between ingestion of Doxepin, an antidepressant, and the patient's glaucoma and cognitive difficulties). As the Commonwealth Court explained in *McKenzie:*

"[I]n order for scientific testimony indicating that an event causes a particular result to be admitted, there must be a showing, not that the studies establishing the causal relationship follow generally accepted methodologies, but that the existence of the causal relationship is generally accepted by the relevant medical community." *Id.,* 674 A.2d at 1172.

In the matter sub judice, a causal relationship is alleged between the physical injuries received by plaintiff Ramos/Cruse when the deck collapsed[5] and either the

---

5. In the immediate aftermath of the deck collapse, an ambulance was summoned; the plaintiff, complaining of severe pain in her ankle

onset or aggravation of her fibromyalgia syndrome. Expert testimonial evidence of the existence of such a causal relationship in the particular circumstances of this case is admissible under *Frye/Topa* only if a causal potential as a general matter between trauma of the type suffered by the plaintiff in the incident and the fibromyalgia syndrome has "gained general acceptance in the relevant scientific community." *Commonwealth v. Blasioli,* 552 Pa. 149, 153, 713 A.2d 1117, 1119 (1998).[6]

There is no present dispute concerning plaintiff Ramos'/Cruse's diagnosis of fibromyalgia, a syndrome typically described as "a chronic, widespread musculoskeletal pain and fatigue disorder for which the cause is unknown. . . ." [7] Specific diagnostic criteria for fibromyalgia were accepted and published in 1990 by the American College of Rheumatology.[8] It is estimated that

and posterior, was transported to the Paoli Memorial Hospital where she was admitted for examination including x-ray studies which, in the end, revealed no fractures and established that the plaintiff's immediate injuries were limited to an ankle sprain and bruising of the affected areas.

6. Concerning the admissibility of statistical probabilities in DNA forensic analysis the court noted that "[t]his court has generally required that both the theory and technique underlying novel scientific evidence must be generally accepted." *Id.* at 153, 713 A.2d at 1119.

7. "Syndrome description" contained in the political case statement of The Fibromyalgia Network; URL: *http://www.fmnetnews.com.* See also, the materially identical formulation contained in, Buskila, D. et al. "Increased Rates of Fibromyalgia Following Cervical Injury," 40 Arthritis and Rheumatism page 446, March 1997, an authority on which the plaintiff chiefly relies in resisting the instant motions: "Fibromyalgia syndrome (FMS) is a chronic, painful musculoskeletal disorder of unknown etiology."

8. See Wolfe F., Smythe HA., Yunus MB. et al. "The American College of Rheumatology 1990 Criteria for the Classification of

up to two percent of the general United States population, primarily adult women, is affected with fibromyalgia.[9] "Syndromes" differ from "diseases" in that the former are purely descriptive of an association of symptoms and signs that occur together while the latter possess an understood origin, cause and mechanism of action; known as an etiology or pathogenesis.

As principal support for their motions in limine, defendants offer a document published in 1996 and styled: "The Fibromyalgia Syndrome: A consensus report on fibromyalgia and disability" which appeared in volume 23 of The Journal of Rheumatology. Among the conclusions voted upon and approved by "a committee of fibromyalgia experts . . ." [10] are the following:

"While the association between work disability or compensation and FM is well established, data regarding causality are largely absent. . . .

"Overall, then, data from the literature are insufficient to indicate whether causal relationships exists between trauma and FM. The absence of evidence, however, does

Fibromyalgia. Report of the Multicenter Criteria Committee." Arthritis Rheum 1990: vol. 33; Wolfe F. et al., "The ACR Criteria/Classification of FMS," Arthritis & Rheum, February 1990.

9. Wolfe F. et al., "Prevalence and Characteristics of FMS in the General Population," Arthritis & Rheum, January 1995.

10. Convened at the University of British Columbia, Vancouver, Canada and organized by the Physical Medicine Research Foundation in association with the Division of Rheumatology and the Division of Infectious Diseases, University of British Columbia with Dr. Frederick Wolfe M.D., clinical professor of internal medicine and family and community medicine, University of Kansas School of Medicine, as the lead researcher and author.

not mean that causality does not exist, rather that appropriate studies have not been performed." [11]

The "consensus statement" concerning causality is as follows:

"*Causality.* The cause(s) of FM are incompletely understood. There may be events reported by the patient as precipitating and/or aggravating, including physical trauma, emotional trauma, infection, surgery, and emotional or physical stress. In determining the relationship between FM and antecedent events, the physician should consider the patient's opinion, and review the events and pertinent collateral information, including current and past medical and psychosocial history. The chronology of symptoms should be documented." [12]

Defendants additionally rely on a report dated December 31, 2000 prepared by the consensus report's lead researcher, Dr. Frederick Wolfe, on the basis of a review of Carla Ramos'/Cruse's medical records and the transcript of her deposition taken in this case. Dr. Wolfe's statement of his qualifications and introductory remarks concerning fibromyalgia syndrome generally is followed, in part, by the following conclusions concerning causation:

"Causation. In general, physicians have only an incomplete understanding of the mechanisms by which fibromyalgia develops. There are several settings in which fibromyalgia develops: (1) Some individuals appear to develop pain problems in childhood or adolescence and continue those problems through most of their

11. *Id.* at pp. 534-35.
12. *Id.* at p. 536.

life; (2) Some develop gradually increasing pain or fatigue problems in adult life—this is the largest and predominant group of fibromyalgia patients; (3) Some develop pain and fatigue problems suddenly in adult life; (4) a group appears to develop fibromyalgia after some sort of trauma, usually physical trauma, but occasionally after illnesses or surgery; and (5) with the advance of fibromyalgia into the medico-legal setting, almost any stressful or adverse event can be causally associated with fibromyalgia *by the patient*. (emphasis in the original) . . .

"It is possible that causes might differ from individual to individual, or might be multiple. *But the answer to the causal question has not been determined by science. Epidemiological studies that might be able to unravel causal issues in fibromyalgia that follows upon trauma or other events have not been performed.*" [13] (emphasis added)

With respect to plaintiff Carla Ramos/Cruse, Dr. Wolfe first agrees with the fibromyalgia diagnosis and then concludes, on the basis of a detailed review of the plaintiff's medical records which include fibromyalgia diagnoses as early as 1995[14] and related diagnoses of chronic myofascial pain in 1994[15] that the plaintiff's fibromyalgia "was present prior to the [1997 deck collapse] accident." [16] Finally, Dr. Wolfe opines that:

---

13. December 31, 2000 Wolfe report at p. 5.

14. See DeKalb clinic history sheet no. 94243 dated November 10, 1995.

15. See office visit note of Gary S. Skaletsky M.D. dated December 30, 1994.

16. December 31, 2000 Wolfe report at p. 7.

"[b]ased on these data one cannot conclude that the accident caused an exacerbation of her fibromyalgia; only that it was a component of her total illness. There is no reason to expect that she should not have healed almost completely from the accident; particularly in view of the fact that she suffered almost no injury. It is likely that other factors contributed to the worsening of her illness, and that these factors were the pre-existing psychological and behavioral factors that can be seen to be developing in the decade before the accident.

"With reasonable medical certainty, I conclude that the accident of July 1997 did not cause the subsequent illness of which she now complains, nor did it exacerbate it." December 31, 2000 Wolfe report at p. 8.

Thus, the defendants, as proponents of the motions in limine have presented compelling evidence to support their contention that the causal relationship between trauma and fibromyalgia has not gained acceptance among the relevant scientific community as a general proposition and, as a consequence of this general lack of causal consensus as well as the particular absence of causal indicia in plaintiff's medical history, that evidence of such a relationship in the particular circumstances of the plaintiff's claim would be inadmissible.

To this end, defendants further submit and request this court to notice as a judicial determination, the ruling of Judge (now President Judge) Riley of this court in the case captioned *Adrienne J. Karr v. Paoli Memorial Hospital,* docketed to no. 97-0023 in which the court granted a motion in limine precluding evidence of a causal relationship between trauma and fibromyalgia following

extensive argument and a review of the consensus report and eight articles from medical journals presented by plaintiff Karr's counsel in response to the consensus report and in opposition to the motion. Defendants have presented the transcribed record of the judicial proceeding conducted by Judge Riley on January 4 and 5, 2000 including the ultimate ruling of the court granting the motion in limine on the ground that there is no general agreement in the relevant scientific community as to a causal relationship between trauma and fibromyalgia.[17]

In *Yudacufski v. PennDOT,* 499 Pa. 605, 612, 454 A.2d 923, 926 (1982), involving a landowner's appeal from the denial of a request for a change of venue supported by allegations of local prejudice materially identical to allegations which had induced a different judge of the same court in a prior case to grant a venue change, our Supreme Court held that "[a] decision of [a judge of this court] establish[es] the law of [the] judicial district, . . . . It is well-settled that, absent the most compelling circumstances, a judge should follow the decision of a colleague on the same court when based on the same set of facts." *Id.* See also, *Commonwealth v. Starr,* 541 Pa. 564, 664 A.2d 1326 (1995) and *Commonwealth v. McCandless,* 2001 Pa. Super. 168, 2001 WL 611467 (decided June 6, 2001) ("Law of the case" doctrine "embod[ies] the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court . . ."); *Zane v. Friends Hospital,* 770 A.2d 339 (Pa. Super. 2001); *Klein v. Weisberg,* 694 A.2d 644 (Pa. Super. 1997).

---

17. See *Karr v. Paoli Memorial Hospital,* no. 97-0023; notes of testimony, January 5, 2000 at pp. 12-13.

On these authorities alone we would be compelled to grant the instant motions in the absence of persuasive evidence of a pertinent scientific development in the period since Judge Riley's ruling.[18]

In response to the motions in limine, plaintiff submits more than one dozen documents purporting to establish a consensus as to the causal role of trauma in the onset or aggravation of fibromyalgia. We will consider these authorities below seriatim but we note at the outset that none purports to represent a scientific advance either in the period since this court's ruling in *Karr v. Paoli Memorial Hospital* or in the period since the consensus report. More pointedly, these authorities fail to support, much less persuasively establish, the existence of a consensus among scientists as to the cause of fibromyalgia syndrome.

First, and, in our view, most weighty, is an article apparently published in the Journal of Clinical Rheumatology, vol. 3, no. 6, December 1997 entitled "Fibromyalgia consensus report: additional comments." On the specific subject of causality, the additional comments authors first note that "[c]ausal propositions are rarely

---

18. We emphasize that the present inquiry is limited to the existence of a consensus among pertinent practitioners *at this time*. We have no doubt that medical science in general and its understanding of chronic pain syndromes including fibromyalgia will continue to develop. At some time in the future the precise mechanism by which fibromyalgia is caused and the course of the syndrome can be altered may well be a subject concerning which the relevant scientific community has reached consensus. It may even be likely that such a consensus will arise in the near term. That is beside the present point which has to do only with whether such a consensus has been shown to exist *today*.

established with absolute certainty in the realm of medicine" and then propose "[a]n alternative (and better known) model [of causality *i.e.*] the consideration of consistency of association, dose-response relationship, and biologic plausibility." [19]

Notably, however, the authors of additional comments do not assert either that the alternative causal model is generally accepted in the relevant scientific community or that this community, when utilizing the alternative model, arrives (or has arrived) at a consensus as to the causal role played by trauma in the onset or course of the fibromyalgia syndrome. Instead, the additional comments authors continue with the following argument:

"In the context of a legal setting (where the consensus report is likely to be used), causality entails only 51 percent certainty, usually stated in terms of reasonable medical probability. Based on a consistent clinical pattern . . . case-control or descriptive studies . . . and biologic plausibility of central nervous system plasticity . . . it seems more than 51 percent likely that trauma does play a causative role in some FMS patients, as agreed by other independent observers . . . ." *Id.* at 325.

In our view this syllogism misses the mark. The premise that "[i]n the context of a legal setting . . . causality entails only a 51 percent certainty . . . " is simply incorrect. As we have explained, in order to survive a motion in limine brought pursuant to *Frye/Topa* the proponent of evidence of scientific causality must establish general agreement in the relevant scientific commu-

19. *Id.* at 324.

nity that the causal proposition is true. At trial, medical opinions must be given by the expert witness to a reasonable degree of medical certainty.[20] The issue of evidentiary preponderance (*i.e.,* "51 percent") is one for the fact-finder in reaching a verdict after all questions of the admissibility of evidence have been resolved, the evidence has been adduced, and the fact-finder has determined what evidence to credit and the evidentiary weight to be assigned. Evidentiary preponderance is not a test of admissibility and the conclusion derived from this premise by the authors of the additional comments must be disregarded.

Plaintiff also submits a study published in volume 40 of Arthritis and Rheumatism, March 1997 entitled: "Increased rates of fibromyalgia following cervical spine injury—A controlled study of 161 cases of traumatic injury." The conclusion supported by the study as summarized by its authors, including the defendants' expert Dr. Frederick Wolfe, is that "FMS was 13 times more frequent following neck injury than following lower extremity injury."[21] The authors further opine that "[d]espite extensive research, the etiology and pathophysiology of FMS are still unclear. . . . Evidence that trauma can cause FMS comes from a few case series or case reports and is *insufficient* to establish causal relationships."[22] The slight

---

20. See for example, *Michaelson v. W.C.A.B.,* 126 Pa. Commw. 542, 548, 560 A.2d 306, 309 (1989) for the proposition that "a reasonable degree of medical certainty" is equivalent to a statistical probability of 80 percent or more.

21. *Id.* at 446.

22. *Id.* (emphasis added)

support provided by this numerically limited study bolsters the defendants' position.[23]

The third authority advanced by plaintiff, another article by Dr. Wolfe entitled "Post-traumatic fibromyalgia: A case report narrated by the patient," published in 1994 by the American College of Rheumatology, predates the consensus report and draws no general conclusions as to causality.

The fourth authority is the report of plaintiff's expert Dr. Lawrence J. Leventhal dated December 23, 1999, in which the physician concludes:

"Based on careful scrutiny of medical records preceding the accident of July 25, 1997, I conclude that Ms. Ramos' current medical condition is a direct result of the deck collapse accident of July 25, 1997. Although Ms. Ramos was involved in two prior accidents resulting in transient myofascial pain, she fully recovered from these injuries. Additionally, Ms. Ramos was successfully being treated for depression prior to the accident. Her resultant pain and decreased function as a result of the deck collapse led to an exacerbation of her previously controlled depression. *The close temporal relationship between the deck collapse and onset of her fibromyalgia indicate a direct cause and effect relationship.*" [24]

Dr. Leventhal does not assert the existence of a scientific consensus as to the causal relationship between

---

23. We also note in this regard that the deck collapse caused injury to the plaintiff's lower extremity (that is, an ankle sprain) and was not reported as having injured her neck.

24. Leventhal report dated December 23, 1999 at p. 5. (emphasis added)

trauma and fibromyalgia. The particular causal conclusion expressed in the report and quoted above is, by its terms, an example of the classic logical fallacy of concluding causation from chronology alone known generally as non causa pro causa and, as post hoc ergo propter hoc. We agree with the court of appeals' holding in *Black v. Food Lion Inc.,* 171 F.3d 308, 312 (5th Cir. 1999)[25] that this fallacy "is as unacceptable in science as in law."

The fifth through eighth documents submitted by plaintiff are excerpts from the transcribed deposition testimony of Carla Cruse taken on August 17, 2000 and January 14, 1999, and of Henry Ramos taken on February 2, 2000 and January 14, 1999; neither of these deponents has been offered as an expert witness. Therefore, neither of these witnesses is capable of supporting, by their testimony, the existence of a consensus among relevant medical practitioners concerning the cause(s) of fibromyalgia. These documents are not relevant to the issue raised by the instant motions in limine.

The ninth document proffered by the plaintiff is a Center report dated December 22, 1999 prepared by Nathan M. Smukler M.D. Dr. Smukler concludes from an evaluation of plaintiff performed at Thomas Jefferson University Fibromyalgia Center:

"[T]hat at the outset, Ms. Ramos experienced pain induced by the accident; however, over time (weeks or months) the affective (emotional-motivational) component became prominent resulting in anxiety, depression and pain vigilance and subsequently, these feelings were

---

25. This authority is discussed in greater detail below.

expressed as pain hyper-sensitivity (fibromyalgia). It may be reasonably speculated that her time away from work, inability to participate in her favorite activity, walking, decreased income and possibly factors in her psychological composition contributed to an affective component of her pain which ultimately resulted in fibromyalgia." Smukler, December 22, 1999 report at p. 3.

This report lends no support to the existence of the necessary scientific consensus. Moreover, the expert's description of his opinion as a "reasonable speculation" demonstrates the lack of the required certainty. The substance of the opinion—that the plaintiff's fibromyalgia may have been the direct consequence of anxiety, depression, pain vigilance, time away from work, inability to participate in favorite activities, decreased income, and "possibly" psychological factors and an "affective component of her pain" lends scant support to the existence of a causal connection between the deck collapse trauma and fibromyalgia even in the particular case.

The tenth authority submitted is the December 31, 2000 report of Dr. Frederick Wolfe which we have previously described in some detail and which, in fact, is one of the central authorities supportive of the defendants' position that no scientific causal consensus presently exists. As we have noted, Dr. Wolfe's conclusion with respect to the central issue now before us is that "physicians have only an incomplete understanding of the mechanisms by which fibromyalgia develops."[26] Indeed, in this expert's considered view, no uniform consensus presently exists

26. Wolfe report of December 31, 2000 at p. 5.

even as to the legitimacy of fibromyalgia as a diagnosis. "[A]ll physicians do not agree with the legitimacy of fibromyalgia as a medical concept. . . ." *Id.* at p. 6. Finally, as we have discussed in some detail above, Dr. Wolfe's particular conclusions with respect to the plaintiff include "that fibromyalgia was present prior to the [deck collapse] accident" [27] and "that the accident of July 1997 did not cause the subsequent illness of which [the plaintiff] now complains, nor did it exacerbate it." *Id.* at p. 8.

The eleventh authority submitted by the plaintiff is an undated article of undisclosed provenance entitled "Chronic pain solutions" apparently authored by a Mark J. Pellegrino M.D., including the statement that:

"Doctors that treat large numbers of fibromyalgia patients report that the majority of patients say that their fibromyalgia was caused by an injury. In my own private practice, I analyze patients with the diagnosis of fibromyalgia to determine the cause. From 1990 to 1995, 2,000 records of fibromyalgia patients were reviewed. Of those, 65 percent reported the onset of their symptoms of fibromyalgia after a trauma event. Of this group, 52 percent of them were involved in a motor vehicle accident, 31 percent had work injuries, and the remaining 17 percent had another type of trauma; included in this category were sports injuries, recreational injuries, fractures, surgical procedures, head injuries and pregnancy. Of the post-traumatic patients involved in motor vehicle accidents, whiplash injury was the most common type of trauma." *Id.* at unnumbered p. 1. Of course, a catalog

---

27. *Id.* at p. 7.

of patient self-reports does not constitute an epidemiological study and is insufficient to demonstrate anything more than temporal coincidence.

Dr. Pellegrino goes on to describe the study of Dr. Buskila concerning 161 patients (the report of which study published in vol. 40 of the journal *Arthritis & Rheumatism* in March 1997 was the plaintiff's second authority submitted in opposition to the motions in limine) and concludes "[t]his study shows that fibromyalgia is caused by trauma." *Id.* at unnumbered p. 2. For the reasons we have discussed above, the study, in fact, demonstrates no such causal connection. Dr. Pellegrino does not assert the existence of a scientific consensus as to the causal relationship between trauma and fibromyalgia, the only issue raised by the instant motion.

The twelfth authority submitted by the plaintiff purports to be the 80th chapter of the 11th edition of a text entitled *Arthritis & Allied Conditions—A Text Book of Rheumatology,* published in 1989 by Lea & Febiger, Philadelphia, Pennsylvania. The excerpted chapter, entitled "Non-articular rheumatism and psychogenic musculoskeletal syndrome" and authored by one Hugh A. Smythe (the author is otherwise unidentified), includes the initial observation that "[f]ibrositis syndrome is one of the most common conditions diagnosed in new patients seen by practicing rheumatologists;" notes that "[a] scientific basis for the study of these patients is rapidly evolving, based on data from well-designed prospective studies . . . ," and discusses and distinguishes related conditions or diagnoses including "masked depression," "fibrositic personality," various forms of hysteria and hypochondria, referred pain syndrome, and pyschogenic

musculosketal syndromes including: psychosomatic production of symptoms or disease, exaggeration (or denial), subconscious use of existing disease for secondary gain, conversion reactions,[28] and malingering. As to these conditions, the author concludes that "[t]he clinical presentation differs from the fibrositis syndrome." *Id.* at p. 1251.

The author concludes in a section entitled "Trauma and occupation" that "[t]rauma may initiate a chronic fibrositis syndrome, with a frequency of 24 percent in one study of 95 patients."[29] Among other potential causes, the author lists "[e]xposure to cold, wet, drafts and sudden changes in weather," depression, myalgia following unaccustomed exercise, viral infection, and sleep disturbance.[30] In the section of the chapter entitled "Pathogenesis"[31] the author describes a study in which "many features of the [fibromyalgia] syndrome" were reproduced by experimentally induced sleep disturbance; and opines that these "findings . . . are crucial to developing a theory of pathogenesis. If these results are verified, the syndrome must be essentially a neurologic phenomena—in these authors' terms, a 'painmodulation' disorder involving subcordical and spinal gating mechanisms."[32]

In the absence of information concerning the author of this portion of the text or of the standing of the text itself among practitioners in the field, it is not possible to assess the weight of this evidence or its ability to overcome any of the force of the authorities presented by the

---

28. That is, pyschogenic regional pain and hysteria.

29. *Id.* at p. 1249.

30. *Id.*

31. Meaning the origin and development of a medical condition.

32. *Id.* at p. 1247.

defendants. More importantly, for our present purposes, the views of this author, appearing in a text published in 1989, do nothing to cast doubt on the continuing correctness of the consensus report or of this court's ruling in *Karr v. Paoli Memorial Hospital.* This author does not assert the existence of a scientific consensus as to causality and we certainly could not conclude that such a consensus exists from the fact that this one author has been so persuaded.

The last authority submitted by the plaintiff is a letter evidently appearing in vol. 159, no. 20 of the Archives of Internal Medicine, November 8, 1999 entitled "Patients with fibromyalgia must be treated fairly." The letter comments on an article which appeared in a prior issue of that publication entitled "Fibromyalgia syndrome a decade later: What have we learned?" Arch. Intern. Med. 1999; 159: 777-85, and takes issue particularly with the statement contained in the earlier article that "[e]vidence to determine whether there is a causal relationship between trauma and FM is currently inadequate." The letter author, Thomas J. Ramano M.D. Ph.D. (whose background and expertise is otherwise unrevealed) describes the study of Buskila D., et al. of 161 patients experiencing traumatic injury—which study has been twice the subject of comments herein—and opines that: "[e]very study that has examined the relationship between trauma and fibromyalgia has revealed that trauma can indeed be a potential cause of this painful and frustrating problem."[33]

---

33. Thomas J. Ramano, Arch. Intern. Med. 1999; 159: unnumbered p. 1. Modification of the causal assertion both by the adjective "potential" and by the use of the auxiliary verb "can" constitutes a degree of equivocation unacceptable in this context.

This authority, while insufficient to support any judgment concerning the expertise or standing of its author, effectively memorializes as of the date of its publication, November 8, 1999, the *absence* of scientific consensus. The author is responding by letter to an article that appeared in publication earlier that same year and which asserted the inadequacy of experimental evidence to support a causal conclusion. The fact that the letter author cites a number of studies having, arguably, the opposite import, establishes only that there was at the time of the letter substantial disagreement on this point among practitioners in the field. Under *Frye/Topa*, the existence of such disagreement precludes the admission to the fact-finder of expert evidence of causality.

In sum, none of the authorities presented by the plaintiff has the effect of refuting those marshaled by the defendants and persuasively establishing the absence of a consensus in the relevant scientific community as to the cause[34] of fibromyalgia syndrome generally or a fortiori the particular causal role of trauma in the onset or development of fibromyalgia. Under *Frye/Topa*, the existence of such a consensus is a necessary precondition to admissibility of expert evidence that plaintiff's trauma following the deck collapse caused her fibromyalgia.

Although not brought to our attention by the parties, we note that our conclusion is also consistent with that reached by those courts in other jurisdictions which have considered directly and specifically the admissibility of evidence of a causal connection between trauma and fibromyalgia. In the most significant of these, *Black v.*

---

34. Etiology or pathogenesis.

*Food Lion Inc.,* the plaintiff was injured in a slip and fall accident in the grocery store and won a substantial monetary award before a federal magistrate judge "principally because she had been diagnosed with fibromyalgia syndrome, an illusive but debilitating affliction." [35] The appellate court describes the issue on appeal as "[w]hether [the plaintiff] produced reliable expert evidence that her slip and fall injury caused fibromyalgia . . . ." [36]

The appellate court then analyzes the magistrate's rationale for admission of expert evidence of causality; an evidentiary ruling on which the verdict largely depended. This analysis, involving the meaning and effect of the consensus report, is equally persuasive in the present context[37] and includes the following:

"Thus, the magistrate judge read the [consensus report] to approve 'an accepted protocol in rendering an opinion in terms of reasonable medical probability.' He then found that [the treating physician] followed this protocol by (a) taking a medical history for [the plaintiff], (b) ruling out prior or subsequent 'causes' of fibromyalgia, (c) performing or reviewing physical tests [which all turned up negative], and (d) deducing that the Food Lion fall was the only possible remaining cause of fibromyalgia that appeared nine months later.

"This analysis amounts to saying that because [the treating physician] thought she had eliminated other possible causes of fibromyalgia, even though she does not

35. *Id.,* 171 F.3d at 309.

36. *Id.*

37. And, particularly, in assessing the opinions of plaintiff's experts Leventhal and Smukler.

know the real 'cause,' it had to be the fall at Food Lion. This is not an exercise in scientific logic but in the fallacy of post-hoc propter-hoc reasoning, which is as unacceptable in science as in law. By the same 'logic,' [the treating physician] could have concluded that if [the plaintiff] had gone on a trip to Disney World and been jostled in a ride, that event could have contributed to the onset of fibromyalgia. See *e.g., Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194, 195-96 (5th Cir. 1996) (expert evidence suggesting connection between exposure to ethylene oxide and brain cancer insufficient under *Daubert*).

"The court's task was to determine whether [the treating physician]'s methodology tied the fall at Food Lion by some specific train of medical evidence to [the plaintiff]'s development of fibromyalgia. No one doubts the utility of medical histories in general or the process by which doctors rule out some known causes of disease in order to finalize a diagnosis. But such general rules must, under *Daubert, Kumho Tire [Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999)] and *Moore [v. Ashland Chemical,* 151 F.3d 269 (5th Cir. 1998) (en banc)], be applied fact-specifically in each case. The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

"In this case, neither [the treating physician] nor medical science knows the exact process that results in fibromyalgia or the factors that trigger the process. Ab-

sent these critical scientific predicates, for which there is no proof in the record, no scientifically reliable conclusion on causation can be drawn. [The treating physician]'s use of a general methodology cannot vindicate a conclusion for which there is no underlying medical support." *Black v. Food Lion,* 171 F.3d at 313.

Of course, as we discussed briefly above, the standard of admissibility at issue in *Black v. Food Lion Inc.,* under Fed.R.C.P. no. 702 and *Daubert v. Merrill Dow Pharmacies Inc.,* is significantly less demanding than that which controls our decision under *Frye/Topa.* Specifically, the federal evidentiary standard specifically permits the admission of expert scientific testimony in the absence of a relevant consensus if certain tests of scientific reliability described in *Daubert* are met. In Pennsylvania, in contrast and as we have discussed at length above, the Supreme Court has not decided the issue of the admissibility of novel scientific evidence in the absence of a relevant consensus and governing authorities require general agreement among the particular scientific community. *Frye/Topa.*

With this background, the court of appeals in *Black v. Food Lion* considered the admissibility of evidence of a causal connection between trauma and fibromyalgia and concluded as follows:

"While the medical profession has made significant advances in the diagnosis and treatment of fibromyalgia, experts have recognized that the evidence that trauma actually causes fibromyalgia is 'insufficient to establish causal relationships.' [citing the consensus report] The [consensus report] states,

"Overall . . . data from the literature are insufficient to indicate whether causal relationships exist between trauma and [fibromyalgia]. The absence of evidence, however, does not mean that causality does not exist, rather that appropriate studies have not been performed." *Id.* at 535.

"At least one other commentator has also recognized the severe difficulties associated with identifying the cause of a given patient's fibromyalgia. See Geoffrey Littlejohn, Medico-legal aspects of fibrositis syndrome, 16 Journal of Rheumatology 169, 171-72 (Supp. 1989) ('[T]here is no scientific evidence to suggest that the injury itself results in the pathophysiology of fibrositis syndrome.')." *Black v. Food Lion,* 171 F.3d at 312-13.

After examining the evidence presented by the plaintiff's treating and examining physicians, the court of appeals concludes that, even under the less restrictive federal standard, evidence of scientific causality between trauma and fibromyalgia is inadmissible.

To the same effect, in *Wynacht v. Beckman Instruments Inc.,* 113 F. Supp.2d 1205 (E.D. Tn. 2000) the court held to be unreliable and, therefore, inadmissible, expert testimony of a causal relationship between a chemical spill at the defendant laboratory and the plaintiff's medical conditions including fibromyalgia and chronic fatigue syndrome. The court's discussion of the distinction between diagnostic and causal opinions is particularly helpful in the present context:

"First and foremost, there is a fundamental distinction between [the treating physician]'s ability to render a medical diagnosis based on clinical experience and her

ability to render an opinion on causation of [the plaintiff]'s injuries. [The defendant] apparently does not dispute, and the court does not question, that [the treating physician] is an experienced physician, qualified to diagnose medical conditions and treat patients. The ability to diagnose medical conditions is not remotely the same, however, as the ability to deduce, delineate, and describe, in a scientifically reliable manner, the causes of those medical conditions." *Id.,* 113 F. Supp.2d at 1209.

In *Gross v. King David Bistro Inc.,* 83 F. Supp.2d 597 (D. Md. 2000) testimony of a causal relationship between infection from a food borne pathogen and fibromyalgia syndrome was held to be insufficiently reliable for admission into evidence under *Daubert* and Fed.R.C.P. no. 702. The trial court there writes:

"At this time the empirical data is simply too nascent and tepid to support [the causal] conclusion. The medical studies themselves acknowledge that the causes of fibromyalgia are unknown. At best, these studies only suggest that there is an association between infections and fibromyalgia." [38]

Finally, we do not derive any contrary import from those case authorities including *Neison v. Hines,* 539 Pa. 516, 653 A.2d 634 (1995);[39] *Robinson v. Upole,* 750 A.2d 339 (Pa. Super. 2000); *Condran v. W.C.A.B. (H.B. Reese Candy Co.),* 721 A.2d 1133 (Pa. Commw. 1998); and *The Bachman Company v. W.C.A.B. (Spence),* 683 A.2d 1305 (Pa. Commw. 1996) in which a causal connection between trauma and fibromyalgia syndrome is described either in a context in which causality appears not to have

38. *Id.*
39. Here relied upon by the plaintiff in opposition to the motions.

been challenged or in which a lessor standard of evidentiary admissibility is applicable. For the same reasons we do not derive additional support from such cases as *Livelsberger v. Kreider,* 743 A.2d 494 (Pa. Super. 1999); *Cittrich v. W.C.A.B. (Laurel Living Center),* 688 A.2d 1258 (Pa. Commw. 1997); and *Coffey v. Coffey,* 394 Pa. Super. 194, 575 A.2d 587 (1990) which failed to find a causal relationship between trauma and fibromyalgia under the evidence applicable to the particular cases involved.

We note in this regard that medical testimony of causation in cases involving compensation under the Pennsylvania Worker's Compensation Act, the Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §1 et seq. requires only that the testimonial evidence be unequivocal.[40] *Lewis v. Commonwealth,* 508 Pa. 360, 498 A.2d 800 (1985); *Giant Eagle Inc. v. W.C.A.B. (Thomas),* 725 A.2d 873 (Pa. Commw. 1999); *Cittrich,* 688 A.2d at 1259; *Buczynski v. W.C.A.B. (Richardson-Vicks Inc.),* 133 Pa. Commw. 532, 576 A.2d 421 (1990). As to medical causation generally, in contrast, this Commonwealth uniquely requires definite, affirmative expert testimony of the existence of the causal relationship. See for example, *Nestor v. George,* 354 Pa. 19, 24, 46 A.2d 469, 472 (1946) in which the court held to be inadmissible the treating physician's testimony to the effect that the plaintiff's condition "could have originated in the accident" and wrote the following:

---

40. For this reason we do not find to be helpful in our analysis the opinion of the Kansas Supreme Court reported as *Gleason v. Samaritan Home and Church Mutual Ins. Co.,* 260 Kan. 970, 926 P.2d 1349 (1996) on which plaintiff here relies and which concerned an ultimate appeal from that state's workmen's compensation authorities.

"The witness would have to testify, not that the condition of claimant might have, or even probably did, come from the accident, but that 'in his professional opinion the result in question came from the cause alleged;' for, according to our latest pronouncement on this subject, a less direct expression of opinion would fall below the required standard of proof, and therefore would not constitute legally competent evidence." *Id.* (quoting *Vorbnoff v. Mesta Machine Co.,* 286 Pa. 199, 206, 133 A. 256, 258 (1926)).

To the same effect, the court in *McMahon v. Young,* 442 Pa. 484, 485, 276 A.2d 534, 535, (1971) held to be inadmissible testimony that the injury "is consistent with" the accident; that "there is probably a cause and effect relationship," and that the patient's arthritic condition "is consistent with traumatic arthritis." The court explains the necessity of a stringent standard of proof in the following terms:

"The issue is not merely one of semantics. There is a logical reason for the rule. The opinion of a medical expert is evidence. If the fact-finder chooses to believe it, he can find as fact what the expert gave as an opinion. For a fact-finder to award damages for a particular condition to a plaintiff it must find as a fact that the condition was legally caused by the defendant's conduct. Here, the only evidence offered was that it was 'probably' caused, and that is not enough. Perhaps in the world of medicine nothing is absolutely certain. Nevertheless, doctors must make decisions in their own professions every day based on their own expert opinions. Physicians must understand that it is the intent of our law that if the plaintiff's medical expert cannot form an opinion

with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment." *Id.* at 486, 276 A.2d at 535. See also, 31 Am. Jur. 2d, *Expert and Opinion Evidence* §§258 and 260 (1989).[41]

The expressed concerns of the court in *McMahon v. Young* are equally pertinent here.

For all of these reasons and on the basis of these authorities we conclude that evidence of a causal relationship between trauma and the onset or course of fibromyalgia would be inadmissible under *Frye/Topa* or under the less restrictive test of *Daubert;* and we enter the following:

### ORDER

And now, June 22, 2001 on consideration of the motions in limine of defendants Modern Exterminating and Control Co. Inc. and Norman and Rosyln Stephen seeking preclusion of evidence of a causal link between a deck collapse on July 25, 1997 and plaintiff Carla Ramos' (now Carla Cruse) fibromyalgia syndrome or its aggravation; plaintiff's initial response thereto; Modern's reply to plaintiff's initial response; and plaintiffs surreply in opposition to the motion; it is hereby ordered that the prayer of the motions in limine is granted. Plaintiff Carla Ramos/Cruse shall adduce at trial no evidence of a causal relationship, either direct or indirect, between the deck collapse and her fibromyalgia syndrome or any aggravation or exacerbation thereof.

---

41. Marginal notes 25 and 38 discuss the unique stringency of Pennsylvania's evidentiary requirement.