**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**No. 97-11404**

---

**MAXINE BLACK; and,
JAMES BLACK;**

**Plaintiffs-Appellees,**

**v.**

**FOOD LION, INC.;**

**Defendant-Appellant,**

---

**Appeal from the United States District Court for the
Northern District of Texas**

---

March 30, 1999

Before JONES, SMITH, and EMILIO M. GARZA, Circuit Judges.

EDITH H. JONES, Circuit Judge:

While shopping at a Food Lion grocery store, Maxine Black slipped and fell on the remains of a mayonnaise spill that had been previously cleaned by Food Lion personnel. In the ensuing damage action, removed to federal court, a magistrate judge awarded Black nearly $300,000 -- principally because she had been diagnosed with fibromyalgia syndrome, an elusive but debilitating affliction. Whether Black produced reliable expert evidence that her slip-and-fall injury caused fibromyalgia is the fulcrum of Food Lion's appeal. We conclude she did not. The Supreme Court's recent decision in <u>Kumho Tire Co., Ltd. v. Carmichael</u>, No. 97-1709, 1999

W.L. 152455, --- U. S. ---, --- S. Ct. --- (March 23, 1999), reinforces our decision. The case is affirmed in part, reversed in part, and remanded.

## I.  BACKGROUND

At a Food Lion Store in Grand Prairie, Texas, a stocker dropped a jar of mayonnaise on September 9, 1993. The jar broke, spilling its contents on the floor. The stocker attempted to clean the spill with a paper towel. The store manager inspected and approved the clean-up. Unbeknownst to the manager, a film of mayonnaise remained on the floor.

While escorting her daughter to the restroom a bit later, Black slipped on the mayonnaise film and fell to the floor. She immediately complained of lower back and arm pain, a headache, and dizziness. Black and her husband reported the injury to Food Lion immediately, and Black sought medical treatment.

Over the next several months, Black was treated and medicated by Dr. James Pollifrone. Despite extensive testing and physical therapy, Dr. Pollifrone was unable to identify any physical basis for Black's continued complaints of pain. All objective tests for pain, including an MRI, EMG, and diskogram, produced results within normal limits.

On May 11, 1994, Black was referred to Dr. Mary Reyna for an evaluation. Dr. Reyna is a physician certified by the American Board of Physical Medicine and Rehabilitation and by the American

Board of Pain Medicine; she specializes in treating patients with persistent pain. Following several weeks of treatment, Dr. Reyna diagnosed Black with a condition known as fibromyalgia syndrome. Fibromyalgia is characterized by complaints of generalized pain, poor sleep, an inability to concentrate, and chronic fatigue. The condition is most common in women between the ages of 30 and 50 and is often associated with hormonal problems. Dr. Reyna hypothesized that the fall at Food Lion caused physical trauma to Black, which caused "hormonal changes," which caused Black's fibromyalgia.

Following removal, the case was tried to a magistrate judge without a jury. Food Lion maintained that its actions were not negligent and that the evidence was insufficient to support Black's claim that the fall caused her fibromyalgia. At the core of Food Lion's defense was the contention that Dr. Reyna's testimony could not causally link the fall at Food Lion with Black's present medical condition with any degree of medical certainty. Food Lion also challenged Black's proof regarding her lost earnings and medical expenses. The trial court rejected Food Lion's arguments, allowed Dr. Reyna to testify over objection, and awarded judgment to Black.

## II.  ANALYSIS

We review the trial court's factual findings for clear error and its conclusions of law de novo.  See Seal v. Knorpp, 957 F.2d 1230, 1234 (5th Cir. 1992).  Food Lion contests only perfunctorily the determination that it was legally responsible for the damages arising from its negligence.  We find no error and affirm on liability.  The extent of Black's damages and their relation to Food Lion's negligence are hotly disputed.

Black's burden under Texas law was to prove to a reasonable degree of medical certainty, based on a reasonable medical probability and scientifically reliable evidence, that her fall at Food Lion caused the fibromyalgia syndrome.  See Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711-12 (Tex. 1997) ("possibility, speculation, and surmise" insufficient to support expert testimony regarding causation).  She relied on the proffered expert testimony of Dr. Reyna to carry this burden.  The magistrate judge admitted Dr. Reyna's expert opinion notwithstanding Food Lion's challenge under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharms., Inc.[1]  Without explicitly tying Dr. Reyna's testimony to the standards for scientific reliability set out in Daubert, the magistrate judge based his decision on several factors:

---

[1]See 509 U.S. 579, 113 S. Ct. 2786 (1993).

4

[T]he court looks to the trial testimony presented by Dr. Reyna as well as that of the other medical experts whose testimony was presented by deposition.

* * * *

Despite the elusiveness which forecloses an <u>absolute</u> determination of causality, the specialists in the field recognize an accepted protocol in rendering an opinion in terms of reasonable medical probability. See Plaintiff's Exhibit 20, at page 536; <u>Causality</u>.

The evidence in this case reflects that Dr. Reyna followed this protocol in reaching her opinion, by ruling out other possible causes for Ms. Black's fibromyalgia. Specifically, the documentary evidence and the testimony of Dr. Reyna show that Dr. Reyna fully apprised herself of Ms. Black's prior medical history before the accident, that she determined that no post-accident incident was an intervening cause for the onset of Ms. Black's fibromyalgia, and that no other factors -- based upon her review of tests performed prior to accepting Ms. Black as a patient, as well as those tests which Dr. Reyna, herself, directed to be made -- contributed to Ms. Black's fibromyalgia.

Following <u>Daubert</u>, the Supreme Court and this court will reverse the district court's admission of expert testimony only for an abuse of discretion in the trial court's ultimate determination of scientific reliability. See <u>Moore v. Ashland Chemical</u>, 151 F.3d 269, 274 (5th Cir. 1998) (en banc). In a just-released opinion, the Supreme Court explained that abuse of discretion review also governs a trial court's decision about <u>how</u> <u>to</u> determine scientific reliability. See <u>Kumho Tire</u>, 1999 W.L. 152455, at *11. <u>Kumho Tire</u> affirmed that <u>Daubert</u>'s principles concerning the reliability-assurance function of Rule 702 apply to technical or specialized expert testimony as well as to scientific expert testimony. See

5

<u>Kumho Tire</u>, 1999 W.L. 152455, at \*9.  While <u>Kumho Tire</u> dealt specifically with engineering testimony, its reasoning fully supports this court's en banc conclusion in <u>Moore</u> that <u>Daubert</u> analysis governs expert medical testimony.  <u>See</u> <u>Moore</u>, 151 F.3d at 275 n.6.

Further, <u>Kumho Tire</u> refines in a common-sense way, but does not undermine, the use of the specific <u>Daubert</u> factors as a reference point for gauging the reliability of potential expert testimony.  Justice Breyer put it this way:

> The petitioners ask more specifically whether a trial judge determining the "admissibility of an engineering expert's testimony" may consider several more specific factors that Daubert said might "bear on" a judge's gate-keeping determination.  These factors include:
>
> --Whether a "theory or technique . . . can be (and has been) tested";
> --Whether it "has been subjected to peer review and publication";
> --Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
> --Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."
>
> Emphasizing the word "may" in the question, we answer that question yes.

<u>Kumho Tire</u>, 1999 W.L. 152455, at \*9 (citing <u>Daubert</u>, 509 U.S. at 592-94, 113 S. Ct. at 2796-97).

<u>Kumho Tire</u>'s emphasis on the word "may" should not be misunderstood to grant open season on the admission of expert

6

testimony by permitting courts discretionarily to disavow the Daubert factors. On the contrary, the Supreme Court simply recognized the obvious facts that there are many kinds of experts and expertise, that the Daubert inquiry is always fact-specific, and that the Daubert factors may not all apply even to the admissibility of pure scientific testimony. Kumho Tire also stressed that the Daubert factors may be relevant to the reliability of experience-based testimony. The overarching goal of Daubert's gate-keeping requirement, however,

> is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

Kumho Tire, 1999 W.L. 152455, at *10.

Applying its articulated principles to the question presented by Kumho Tire -- whether an engineering expert could reliably testify on the cause of an automobile tire failure -- the Supreme Court upheld a district court decision to exclude the evidence. The district court found that the expert's methodology satisfied neither the Daubert criteria nor any other factors operating in favor of admissibility which could outweigh those identified in Daubert. The Supreme Court reiterated that the expert's self-proclaimed accuracy is insufficient:

> [A]s we pointed out in Joiner, "nothing in either Daubert or the Federal Rules of Evidence requires a district

7

court to admit opinion evidence that is connected to existing data only by the <u>ipse</u> <u>dixit</u> of the expert."

<u>Kumho Tire</u>, 1999 W.L. 152455, at *14 (citing <u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997)).

<u>Kumho Tire</u> thus does not require district courts to reinvent the wheel every time expert testimony is offered in court. Just as the Supreme Court relied on the <u>Daubert</u> factors in <u>Kumho Tire</u>, those factors may be used as a starting-point for analysis in the usual case. <u>See</u>, <u>e.g.</u>, <u>Moore</u>, 151 F.3d at 275 (noting <u>Daubert</u>'s "five-factor, non-exclusive, flexible test" for determining the reliability of expert testimony); <u>Watkins v. Telsmith, Inc.</u>, 121 F.3d 984, 988-89, 990-91 (5th Cir. 1997) ("Not every guidepost outlined in <u>Daubert</u> will necessarily apply to expert testimony . . . but the district court's 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid . . .' is no less important." (citing <u>Daubert</u>, 509 U.S. at 592-93, 113 S. Ct. at 2796)). In the vast majority of cases, the district court first should decide whether the factors mentioned in <u>Daubert</u> are appropriate. Once it considers the <u>Daubert</u> factors, the court then can consider whether other factors, not mentioned in <u>Daubert</u>, are relevant to the case at hand.

The magistrate judge did not have the benefit of <u>Kumho Tire</u>, or of our en banc decision in <u>Moore</u>, when he admitted Dr.

8

Reyna's testimony. But as we have noted, both those opinions represent refinements of Daubert rather than modifications of its essential holding. More to the point, the magistrate judge's opinion does not even cite Daubert, although, giving his above-quoted statements the benefit of the doubt, the magistrate judge attempted objectively to justify the admission of Dr. Reyna's testimony. Unfortunately, he failed. Dr. Reyna's testimony does not bear the necessary indicia of intellectual rigor, whether measured by Daubert or by the magistrate judge's reasoning. Because the magistrate judge misapplied the Daubert tests and failed to articulate any satisfying alternative standards, we hold that he abused his discretion in admitting Dr. Reyna's testimony.

While the medical profession has made significant advances in the diagnosis and treatment of fibromyalgia, experts have recognized that the evidence that trauma actually causes fibromyalgia is "insufficient to establish causal relationships." Frederick Wolfe, The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability, 23:3 The Journal of Rheumatology 534, 534 (1996) ("the Vancouver Report"). The Vancouver Report states,

Overall . . . data from the literature are insufficient to indicate whether causal relationships exist between trauma and [fibromyalgia]. The absence of evidence, however, does not mean that causality does not exist, rather that appropriate studies have not been performed.

9

Id. at 535.[2]  At least one other commentator has also

[2]The Vancouver Report chronicles in detail the apparent lack of scientific studies regarding the specific causes of fibromyalgia:

> *Causality*. [Fibromyalgia] in the setting of work disability or compensation has been the subject of a number of reports.  While the association between work disability or compensation and [fibromyalgia] is well established, data regarding causality are largely absent. The clinical dilemma, whether an injury or workplace stress caused the patient's [fibromyalgia], a retrodictive (or It Did) causal proposition[,] can rarely be determined to be certainly true or certainly false. Evidence that trauma can cause [fibromyalgia], a potential (or It Can) causal proposition, comes from a few case series or case reports and is insufficient to establish causal relationships.  That trauma might cause [fibromyalgia] sometimes, a predictive (or It Will) causal proposition, can only be addressed by epidemiological studies that measure the risk of potential exposures on the development of [fibromyalgia]. Epidemiologic studies of trauma and [fibromyalgia] needed to address potential or predictive causality are currently not available.  The [fibromyalgia] causality issue, as in other putative work and injury related syndromes, may be further complicated by the potential influence of the availability of compensation for the syndrome.  In settings where compensation is widely available, illnesses similar to [fibromyalgia] have been shown to increase in apparent prevalence, as measured by physician visits, then to fall when compensation availability declines.

> Overall, then, data from the literature are insufficient to indicate whether causal relationships exist between trauma and [fibromyalgia].  The absence of evidence, however, does not mean that causality does not exist, rather that appropriate studies have not been performed.

See Vancouver Report, 23:3 The Journal of Rheumatology at 534-35. The Vancouver Report goes on to recommend several courses of action for fibromyalgia researchers, including: (1) "Eliminate the terms 'reactive' and 'post-traumatic fibromyalgia'."; (2) "The

recognized the severe difficulties associated with identifying the cause of a given patient's fibromyalgia. See Geoffrey Littlejohn, Medicolegal Aspects of Fibrositis Syndrome, 16 Journal of Rheumatology 169, 171-72 (Supp. 19 1989) ("[T]here is no scientific evidence to suggest that the injury itself results in the pathophysiology of fibrositis syndrome."). Thus, "whether an injury . . . caused the patient's [fibromyalgia], a retrodictive (or It Did) causal proposition[,] can rarely be determined to be certainly true or certainly false." See Vancouver Report, 23:3 The Journal of Rheumatology at 534.

Daubert, as noted above, lists four non-exclusive factors to consider when assessing the scientific validity or reliability of an expert's testimony. See 509 U.S. at 593-95, 113 S. Ct. at 2796-97. Dr. Reyna's theory -- that the fall caused trauma which caused hormonal damage leading to fibromyalgia -- fails these tests. First, Dr. Reyna's theory has not, according to the evidence at trial,[3] been verified by testing and, thus, has not

relationship between [fibromyalgia] and putative precipitating and aggravating factors should be studied."; and, (3) "Studies investigating the pathogenesis of work or injury related [fibromyalgia] should be undertaken, including those that explore basic mechanisms." See id. at 537.

[3]Although Black attempted to admit into evidence more recent studies allegedly demonstrating a causal link between physical

11

been peer-reviewed. In fact, Dr. Reyna acknowledged that fibromyalgia has no known etiology (i.e., medical science does not know if the cause of the condition is muscle, nerve, or hormone damage). See also Vancouver Report, 23:3 The Journal of Rheumatology at 534 (noting lack of epidemiological studies regarding trauma and causal link, if any, to fibromyalgia). If medical science does not know the cause, then Dr. Reyna's "theory" of causation, to the extent it is a theory, is isolated and unsubstantiated. Even Dr. Reyna recognized the limits of her opinion. When asked whether she had been able to identify the cause of Black's fibromyalgia, she stated, "I didn't find the cause. I found an event that contributed to the development of the symptom. I did not find the cause." On its own terms, Dr. Reyna's opinion includes conjecture, not deduction from scientifically-validated information.

It also follows from the scientific literature that Dr. Reyna's theory has failed to gain acceptance within the medical profession. Experts in the field conclude that the ultimate cause of fibromyalgia cannot be known, and only an educated guess can be made based on the patient's history. See id. at 536. Mere conjecture does not satisfy the standard for general acceptance,

_____

trauma and fibromyalgia, the trial court excluded the evidence because the studies had not been properly produced to opposing counsel during discovery.

12

except to demonstrate general acceptance of a proposition contrary to Dr. Reyna's. Finally, Dr. Reyna's theory of causation, which has not been verified or generally accepted, also has no known potential rate of error.

The magistrate judge either substituted his own standards of reliability for those in <u>Daubert</u>, or he confused the <u>Daubert</u> analysis by adopting an excessive level of generality in his gatekeeping inquiry. Thus, the magistrate judge read the <u>Vancouver Report</u> to approve "an accepted protocol in rendering an opinion in terms of reasonable medical probability."[4] He then found that Dr. Reyna followed this protocol by (a) taking a medical history from Black, (b) ruling out prior or subsequent "causes" of fibromyalgia, (c) performing or reviewing physical tests [which all turned up negative], and (d) deducing that the Food Lion fall was the only possible remaining cause of fibromyalgia that appeared nine months later.

This analysis amounts to saying that because Dr. Reyna thought she had eliminated other possible causes of fibromyalgia, even though she does not know the real "cause," it had to be the fall at Food Lion. This is not an exercise in scientific logic but in the fallacy of *post-hoc propter-hoc* reasoning, which is as

---

[4]We assume *arguendo* that the <u>Vancouver Report</u> contains some protocol, although it does not appear to be specifically articulated therein.

unacceptable in science as in law. By the same "logic," Dr. Reyna could have concluded that if Black had gone on a trip to Disney World and been jostled in a ride, that event could have contributed to the onset of fibromyalgia. See, e.g., Allen v. Pennsylvania Eng'g Corp., 102 F.3d 194, 195-96 (5th Cir. 1996) (expert evidence suggesting connection between exposure to ethylene oxide and brain cancer insufficient under Daubert).

The court's task was to determine whether Dr. Reyna's methodology tied the fall at Food Lion by some specific train of medical evidence to Black's development of fibromyalgia. No one doubts the utility of medical histories in general or the process by which doctors rule out some known causes of disease in order to finalize a diagnosis. But such general rules must, under Daubert, Kumho Tire, and Moore, be applied fact-specifically in each case.[5]

---

[5]In Kumho Tire, the Supreme Court points out that

> the specific issue before the [district] court was not the reasonableness in general of a tire expert's use of a visual and tactile inspection to determine whether overdeflection had caused the tire's tread to separate from its steel-belted carcass. Rather, it was the reasonableness of using such an approach, along with Carlson's particular method of analyzing the data there obtained, to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant.

1999 W.L. 152455, at *12 (emphasis added). The Supreme Court then reviewed the expert's exact methodology and found it imprecise, based on a superficial examination of the tire, inconsistent with the expert's previous statements, and unsupported by any other tire experts or outside research. The court reiterated:

14

The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

In this case, neither Dr. Reyna nor medical science knows the exact process that results in fibromyalgia or the factors that trigger the process. Absent these critical scientific predicates, for which there is no proof in the record, no scientifically reliable conclusion on causation can be drawn. Dr. Reyna's use of a general methodology cannot vindicate a conclusion for which there is no underlying medical support.

The magistrate judge should have first applied the Daubert criteria to this case. Had that been done, the utter lack of any medical reliability of Dr. Reyna's opinion would have been quickly exposed. If the magistrate judge thought he was applying Daubert, however, he fatally erred by applying its criteria at a standard of meaninglessly high generality rather than boring in on

the question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case.

Id., 1999 W.L. 152455, at *13 (quotation marks and citation omitted).

15

the precise state of scientific knowledge in this case. Alternatively, if the magistrate judge decided to depart from Daubert, he failed to articulate reasons for adopting the test he used. In particular, he failed to show why an alternate test was necessary to introduce "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 1999 W.L. 152455, at *10.

As Dr. Reyna's testimony was unsupported by a specific methodology that could be relied upon in this case and contradicted by the general level of current medical knowledge, the court abused its discretion by admitting that testimony.

## III. CONCLUSION

Without Dr. Reyna's testimony, Black cannot hold Food Lion liable for medical expenses, lost wages, or pain and suffering attributable to her fibromyalgia. Black may only be compensated for the damages and medical expense incurred for the treatment of her direct physical injuries caused by her fall at Food Lion. The case is remanded for recalculation of damages consistent with the foregoing.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

16